## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONAL CITY BANK | : | |
| OF INDIANA, *et al.,* | : | |
| | : | |
| V. | : | CIVIL ACTION NO. |
| | : | CCB-04-2719 |
| | : | |
| CHARLES W. TURNBAUGH, | : | |
| Commissioner of Financial | : | |
| Regulation, Maryland Department | : | |
| of Labor, Licensing and Regulation | : | |
| | : | |
| | : | |

### (AMENDED) MEMORANDUM

National City Bank of Indiana ("National City Bank" or "the Bank"), a national bank that

provides mortgage services to homeowners in Maryland through its wholly-owned operating

subsidiaries First Franklin Financial Corporation ("First Franklin") and National City Mortgage

Company ("National City Mortgage"), has filed suit along with its subsidiaries seeking declaratory and

injunctive relief enjoining the Maryland Department of Labor, Licensing, and Regulation from enforcing

Md. Code Ann. Com. Law § 12-105(b)(4), a Maryland law that restricts the amount of prepayment

fees mortgage lenders may impose, on the theory that the Maryland law is preempted under the

Supremacy Clause of the Constitution by the National Bank Act and the associated regulations

promulgated by the federal Office of the Comptroller of the Currency ("OCC").  National City Bank

also contends that, as a national bank, its operating subsidiaries are subject to the exclusive regulatory

and supervisory authority of the OCC, and that therefore Maryland is preempted from exercising any

regulatory or visitorial powers over its subsidiaries under the Maryland Mortgage Lender Law, Md.

Code Ann. Fin. Inst. §§ 11-501, *et seq.*  After the parties reached an agreement as to a preliminary

injunction pending the outcome of this litigation,[1] the plaintiff National City Bank, along with its

subsidiaries, moved for summary judgment and a permanent injunction (docket entry no. 24), and the

defendant Charles W. Turnbaugh, Commissioner of Financial Regulation of the Maryland Department

of Labor, Licensing and Regulation ("Commissioner") responded with a cross-motion for summary

judgment (docket entry no. 30).[2]  Oral argument was heard  on January 28, 2005.  For the reasons

stated below, I find that Maryland's laws are preempted under Article VI of the Constitution by the

National Bank Act,12 U.S.C. § § 24(Seventh), 371, 484, and the OCC implementing regulations,

including 12 C.F.R. §§ 5.34, 7.4000, 7.4006, 34.21, and 34.23.  ~~The defendant's motion for summary~~

~~judgment will be denied~~, the plaintiffs' motion for summary judgment will be granted, and a permanent

injunction enjoining the Commissioner from enforcing the questioned Maryland state laws against

---

[1]The parties' Stipulation to Entry of a Preliminary Injunction provides that the Commissioner and any agents from his office are enjoined from enforcing the Maryland Mortgage Lender Law, Md. Code Ann. Fin. Inst. §§ 11-501 *et seq.,* and the Maryland Prepayment Restriction, Md. Code Ann. Com. Law § 12-105(b)(4), against the plaintiffs, and from exercising any visitorial powers as defined in 12 C.F.R. § 7.4000 in any manner over plaintiffs.  The plaintiffs have agreed to maintain records of all mortgage loans in Maryland that contain prepayment fees for so long as the preliminary injunction remains in effect, in order to facilitate the reimbursement of customers who pay such fees should the court find the Maryland Prepayment Restriction applies to the plaintiffs. *(See* Stipulation to Entry of a Preliminary Injunction, docket entry no. 19.)

[2]Briefs *Amici Curiae* have been filed in support of the defendant by the Conference of State Bank Supervisors (docket entry no. 36); the states and commonwealths of Connecticut, Arizona, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Vermont and Washington (docket entry no. 39); and in support of the plaintiffs by the OCC (docket entry no. 42).

National City Bank's operating subsidiaries shall be entered.[3]


## BACKGROUND

The following facts are undisputed.  Plaintiff National City Bank of Indiana is a national banking association organized and existing under the National Bank Act, 12 U.S.C. § 21 *et seq.*  National City Bank's principal place of business is Indianapolis, Indiana and it maintains no branch offices in Maryland.  (*See* Pls.' Mot. for Summ. J., Ex. 4, Decl. of Mary McGuirk at ¶ 2.) National City Bank wholly owns and operates First Franklin and National City Mortgage as operating subsidiaries to conduct the Bank's residential mortgage lending.  (*Id.* at ¶¶ 3, 4.)  First Franklin is incorporated in Delaware and its principal place of business is San Jose, California.  (*Id*. ¶ 3.)   National City Mortgage is incorporated in Ohio and its principal place of business is Miamisburg, Ohio.  (*Id*. ¶ 4.)  Both First Franklin and National City Mortgage engage in residential mortgage lending throughout the United States and in Maryland.  (*Id*. ¶¶ 3, 4.)   Both operating subsidiaries provide Adjustable Rate Mortgages ("ARMs") in Maryland, some of which impose prepayment penalties in conflict with Maryland law.  (*Id.* ¶¶ 5,6.)

The defendant Commissioner is the state official charged with enforcing the Maryland Mortgage Lender Law ("MMLL"), Md. Code Ann. Fin. Inst. §§ 11-501, *et seq.*, which  provides for the licensing, regulation, supervision, examination, and enforcement of applicable laws for Maryland

---

[3]Although initially the plaintiffs indicated they would seek attorney's fees pursuant to 42 U.S.C. § 1988, they confirmed after the January 28, 2005 hearing that they do not intend to seek such fees. (*See* Notice Regarding Intent Not to Seek Attorney's Fees, docket entry no. 48.)

residential mortgage lenders.  The Commissioner is also responsible for ensuring that licensed mortgage

lenders comply with Md. Code Ann. Com. Law § 12-105(b)(4) ("Maryland Prepayment Restriction"),

a provision that restricts the prepayment penalties lenders may impose on mortgagees.

According to the defendant, National City Mortgage was first licensed under the MMLL in

June 1989; it currently has 62 licenses to do mortgage lending in Maryland.  (Def.'s Cross Mot. for

Summ. J. at 5.)  National City Mortgage has 30 locations in Maryland and 32 locations out of the state

that do business in Maryland. (*Id.*)    First Franklin was licensed in Maryland under the MMLL from

1994 through December 31, 2003, when it did not renew its licenses.  (*Id.* at 6.)  When it was licensed,

First Franklin held twelve licenses to do mortgage lending at three locations in Maryland and nine

locations outside of Maryland.  (*Id.* at 7.)  Over the years the Commissioner has performed numerous

examinations of the books and records of National City Mortgage and First Franklin to ensure

compliance with the MMLL, as well as investigated some consumer complaints filed against the

lenders.  (*Id.* at 6-7.)

The present controversy arose from two consumer complaints filed with the Commissioner

against First Franklin in June and July of 2004.  In response to the first complaint, Marcia Tonkins, a

Financial Examiner in the Office of the Commissioner, sent a letter to First Franklin stating that the

bank's Prepayment Note Addendum appeared to violate the Maryland Prepayment Restriction, which

provides that "a lender may charge a prepayment penalty not exceeding two months' advance interest

on the total amount of all prepayments made in any 12-month period in excess of one third of the

amount of the original loan." (*See* Pls.' Mot. for Summ. J., Ex. A, June 29, 2004 letter from Marcia

Tonkins).  Tonkins asked First Franklin to provide "a list of all Maryland residents charged a

4

prepayment penalty after July 1, 2003." (*Id.*)  First Franklin responded with a letter stating that it

would waive the prepayment penalty for the loan in question, but asserting that such penalties are

permissible under federal law, and therefore the Commissioner had no need for a list of Maryland

residents charged a prepayment penalty after July 1, 2003.  (*Id.*, Ex. B, July 20, 2004 letter from

Deborah Novacek.)  The second consumer complaint was received by the Commissioner in July 2004.

It stated in pertinent part that "I signed this mortgage note being aware of the prepayment penalty.

However, I was informed by friends that prepayment penalties are illegal in the state of MD.  I am in

the process of selling my house and I need to know if I will have to pay the penalty." (*Id.*, Ex. C., July

20, 2004 letter.)  The complaint was forwarded to First Franklin, which responded to the consumer

with the explanation that the prepayment penalty is permissible under federal law.  (*Id.*, Ex. D, Aug. 11,

2004 letter from Mary McGuirk.)  To prevent any further action by the Commissioner, National City

Bank filed this suit on August 20, 2004.[4]


## ANALYSIS

---

[4]As of January 1, 2005, National City Bank restructured its mortgage lending business so that
First Franklin and National City Mortgage ceased to originate loans.  The operating subsidiaries
changed their names from First Franklin Financial Corporation to First Franklin Financial Companies
and from National City Mortgage Co. to National City Mortgage, Inc.  Under the new arrangement,
National City Bank originates loans rather than the subsidiaries, which instead service some of the
Bank's loans and engage in secondary market activities.  National City Bank, National City Mortgage
and First Franklin continue to be under the supervision and examination of the OCC.  The parties
agreed at oral argument that the reorganization does not make moot the issues pending in this case, as
the Commissioner still seeks visitorial powers over existing operating subsidiaries and continues to
challenge the loans made prior to January 1, 2005. (*See* Pl.'s Opp. To Def.'s Cross Mot. for Summ.
J., Jan. 6, 2005 Decl. of John V. Konyk, docket entry no. 43; Supp. Decl. by John V. Konyk, Jan. 18,
2005, docket entry no. 46; and Jan. 28, 2005 Hearing Transcript at 4-7 and 23-25.)

This case presents solely questions of law and therefore should be resolved on summary judgment.[5]  The issue before the court is whether the Maryland Commissioner's efforts to exercise licensing and visitorial powers over the operating subsidiaries of national banks in Maryland, including the effort to enforce a Maryland law prohibiting mortgage prepayment penalties, are preempted by the National Bank Act and the regulations promulgated thereunder by the OCC.  This court finds, consistent with several other federal district courts' review of similar cases, that the Maryland laws are preempted by the federal regulatory regime established pursuant to the National Bank Act.  *See Wachovia Bank, N.A. v. Burke,* 319 F. Supp. 2d 275 (D.Conn. 2004), *appeal docketed,* No. 04-3770 (2d Cir.); *Wachovia Bank, N.A. v. Watters,* 334 F. Supp. 2d 957 (W.D. Mich. 2004), *appeal docketed,* No. 04-2257 (6th Cir.); *Wells Fargo Bank, N.A. v. Boutris,* 265 F.Supp.2d 1162 (E.D.Cal. 2003), *appeal docketed,* No. 03-16194 (9th Cir.); *National City Bank of Indiana v. Boutris,*  2003 WL 21536818 (E.D. Cal. July 2, 2003), *appeal docketed,* No. 03-16461 (9th Cir.).

I.  *National Legal Framework*

National City Bank is chartered and organized under the National Bank Act, 12 U.S.C. § 21 *et seq.* ("the Act"), a law enacted by Congress in 1864 to "protect national banks against intrusive regulation by the States," in order to "'facilitate...a national banking system.'"  *Bank of America v.*

---

[5] Fed. R. Civ. P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*City and County of San Francisco,* 309 F.3d 551, 561 (9th Cir. 2002) (quoting *Marquette Nat'l*

*Bank v. First of Omaha Serv. Corp.,* 439 U.S. 299, 314-315, 99 S.Ct. 540, 549 (1978)).  The

OCC is a bureau of the U.S. Treasury Department charged with licensing, examining, and regulating the

national banks under the National Bank Act and other federal banking laws.  Accordingly,

"considerable weight should be accorded" to its "construction of [the] statutory scheme it is entrusted

to administer." *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837,

844,104 S.Ct. 2778, 2782 (1984).

Three related statutes and regulations issued thereunder are particularly pertinent to the analysis.[6]

First, Congress endowed national banks with specific banking powers, such as receiving deposits and

loaning money, as well as the general authority to exercise "all such incidental powers as shall be

necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh).  The Supreme Court has

held that "the Comptroller. . . has discretion to authorize activities beyond those specifically

enumerated" in § 24 (Seventh). *Nationsbank of North Carolina, N.A. v. Variable Annuity Life Ins.*

*Co.,* 513 U.S. 251, 258  n.2, 115 S.Ct. 810, 814, n.2 (1995).  In furtherance of § 24 (Seventh), the

OCC  issued a regulation providing that: "[a] national bank may conduct in an operating subsidiary

activities that are permissible for a national bank to engage in directly either as part of, or incidental to,

the business of banking, as determined by the OCC..." 12 C.F.R. § 5.34(e)(1).[7]  In order to establish

---

[6]A fourth statutory provision, 12 U.S.C. § 93a, which provides that "the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office," specifically, regulation of the national banking business, is also relevant to the analysis.

[7]The Commissioner agreed at oral argument that the OCC was authorized to issue a regulation permitting national banks to conduct business through operating subsidiaries. (*See* Jan. 28, 2005 Hearing Tr. at 39.) *Cf. Wells Fargo Bank, N.A. v. Boutris,* 265 F.Supp.2d 1162, 1167-68

an operating subsidiary or commence a new activity in an existing operating subsidiary, the national bank must comply with the OCC's licensing and notice filing requirements as specified in 12 C.F.R. § 5.34. The regulation also provides that "[a]n operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank." 12 C.F.R. § 5.34(e)(3).

Second, Congress has provided that: "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law..."[8] 12 U.S.C. § 484(a). State auditors are granted authority to review a national bank's records "solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with such laws." 12 U.S.C. § 484(b). Under the authority of this statute, and others, in 2001 the OCC issued a regulation stating that: "[u]nless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." 12 C.F.R. § 7.4006.

Third, under 12 U.S.C. § 371(a) "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to section 1828(o) of this title and such restrictions and requirements as the Comptroller of the Currency

---

(E.D.Cal. 2003) (observing that the California Commissioner "virtually conceded the OCC's construction of 12 U.S.C. § 24 (Seventh) as authorizing national banks to conduct the business of banking through operating subsidiaries" as reasonable in light of *Nationsbank*).

[8]Visitorial powers refer generally to the "examination, inspection of books and records, regulation or supervision of activities authorized or permitted pursuant to federal banking law, and enforcement of compliance with any applicable federal or state laws and with principles of safe and sound banking." (*See* OCC *Amicus Curiae* Memo. at 3) (citing 12 C.F.R. § 7.4000(a)(2)).

may prescribe by regulation or order."  Pursuant to this statutory authority, the OCC has issued 12

C.F.R. § 34.21,  which provides that "[a] national bank and its subsidiaries may make, sell, purchase,

participate in, or otherwise deal in ARM loans and interests therein without regard to any State law

limitations on those activities."  In addition, "[a] national bank offering or purchasing ARM loans may

impose fees for prepayments notwithstanding any State law limitations to the contrary." 12 C.F.R. §

34.23.[9]  These regulations have been supported by additional agency interpretations provided by the

OCC in letters and their *amicus curiae* brief in this case.[10]


II.  *State Legal Framework*

The Maryland Mortgage Lender Law ("MMLL"), Md. Code Ann. Fin. Inst. §§ 11-501, *et*

*seq.*, was enacted in 1989 to provide a comprehensive regulatory framework for residential mortgage

lending in the state and to better protect consumers.  Under the MMLL, the Commissioner of Financial

Regulation is responsible for ensuring that all mortgage lenders in Maryland are licensed and bonded,

[9]Although 12 C.F.R. § 34.23, unlike 12 C.F.R § 34.21, does not mention operating subsidiaries, 12 C.F.R. §34.1(b) clarifies that 12 C.F.R. Part 34 "applies to national banks and their operating subsidiaries."

[10]*See, e.g.,* Letter of Nov. 4, 1999 from Eric Thompson, Director, Bank Activities and Structure, to Gregory J. Pulles, General Counsel, TCF Financial Corporation, explaining that 12 U.S.C. § 371 "specifically provides authority for national banks to make real estate loans subject to OCC regulations and orders," and "[t]he OCC regulations themselves contain an express preemption of state law restrictions on prepayment fees."  According to Thompson, the federal policy reflects OCC's view that "the ability to charge prepayment fees in connection with ARM loans provides lenders and borrowers with additional flexibility," and this "could encourage the development of ARMS with relatively slow-moving interest rate indexes and long adjustment periods." (Compl., Ex. 2 at 1-2.). *See also* OCC *Amicus Curiae* Memo. at 10-11, stating that the OCC first codified a regulation authorizing national banks to engage in activities through operating subsidiaries in 1966 and that federal law has, with some exceptions, treated subsidiaries as functionally equivalent to their parents.

Md. Code Ann. Fin. Inst. § § 11-504, 11-508.  In addition, § 11-515 confers general visitorial powers on the Commissioner.  The Commissioner is empowered to assess a fine or issue cease and desist orders forbidding a lender from conducting business in Maryland if he finds that a licensee has violated or evaded any part of the MMLL or the regulations issued thereunder.  Md. Code Ann. Fin. Inst. § 11-516.  National banks are specifically exempt from the provisions of the MMLL.  Md. Code Ann. Fin. Inst. § 11-502(b)(1).  In addition, if a national bank is headquartered in Maryland or maintains at least one deposit-taking branch in Maryland, then its subsidiaries or affiliates are exempt from the MMLL. Md. Code Ann. Fin. Inst. § 11-502(b)(11) and (c).  Finally, the Maryland law most directly at issue in this case is Md. Code Ann. Com. Law § 12-105(b)(4) ("Maryland Prepayment Restriction"), a provision that limits the terms on which mortgage lenders can impose prepayment penalties on mortgagees.[11]

III.  *Preemption*

Under the Supremacy Clause of Article VI of the U.S. Constitution, "federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions." *College*

---

[11]"A prepayment charge or penalty on a prepayment of the unpaid principal balance of the loan, if the loan is secured by a home, by a combination of home and business property, or by agricultural property, or if the loan is a commercial loan not in excess of $5,000, provided that the charge or penalty: (i) May be imposed only on prepayments made within three years from the date the loan is made; and (ii) May not exceed an amount equal to two months' advance interest on the aggregate amount of all prepayments made in any 12-month period in excess of one third of the amount of the original loan." Md. Code Ann. Com. Law § 12-105(b)(4).

*Loan Corp. v. SLM Corp.,* 396 F.3d 588, 595 (4th Cir. 2005) (internal citations and quotations

omitted).  Federal law may preempt state law under theories of either express, field, or conflict

preemption.  *Id.* at 595-96.  Here, plaintiffs focus on conflict preemption, contending that their

operating subsidiaries should not be subject to conflicting Maryland and federal laws.[12]   *See Florida*

*Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217 (1963) (a

conflict arises when "compliance with both federal and state regulations is a physical impossibility"); *see*

*also Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404 (1941) (conflict occurs when state law

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress").  It is well recognized that "[f]ederal regulations have no less pre-emptive effect than federal

statutes."  *Fidelity Fed. Savings and Loan Assoc., et al., v. de la Cuesta,* 458 U.S. 141, 153, 102

S.Ct. 3014, 3022 (1982).

There is no dispute that the state law, and the Commissioner's attempt to enforce it against

national bank operating subsidiaries First Franklin and National City Mortgage, are in conflict with the

federal regulations that permit prepayment charges and declare that only the OCC may exercise

visitorial powers over the companies. [13] There are two related but analytically distinct frameworks that

may be applied in determining whether the OCC regulations validly preempt state law. While

_____

[12]The OCC suggests that some of the regulations may be "closer to express pre-emption." *See*
Jan. 28, 2005 Hearing Tr. at 19-21. *See also* Compl., Ex. 2, Nov. 4, 1999 letter from Eric Thompson
(stating that 12 C.F.R. § 34.23, the OCC regulation governing ARMs, contains an "express
preemption of state law restrictions on prepayment fees").

[13]As the Supreme Court noted, "[t]he conflict does not evaporate because the Board's
regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses
in their contracts..." *Fidelity,* 458 U.S. at 155.

Congressional intent is critical to both methods of analysis, the focus of each is somewhat different, depending on whether the agency has issued a  regulation interpreting existing law or has determined to issue a pre-emptive regulation pursuant to its delegated authority.

The OCC believes application of the two-part analysis established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778 (1984) would be appropriate, because it views its regulations as interpreting the laws already passed by Congress.  *See Wachovia,* 319 F.Supp.2d at 281-82; *see also* Jan. 28, 2005 Hearing Tr. at 21.  Under *Chevron,*  a court must first determine whether Congress has clearly expressed its intent regarding the issue in question.  If it has, then Congressional intent controls and no further inquiry is necessary.  If not, then the court must decide whether the agency's action is "based on a permissible construction of the statute."  *Chevron,* 467 U.S. at 842-43.  Applying *Chevron*, it appears that Congress has not explicitly stated whether operating subsidiaries of national banks are subject to the exclusive visitorial and regulatory authority of the OCC, or whether state authorities may also exercise oversight and enforce conflicting state laws, specifically the Maryland law restricting mortgage prepayment.  Accordingly, the second part of the *Chevron* analysis would be dispositive.

The Commissioner, however, argues that *Chevron* should not apply because the OCC's regulations are not interpreting a statutory term but rather declaring their preemptive authority over state laws.  If so, the analysis would proceed under the Supreme Court's direction in *Fidelity Federal Savings and Loan Assoc. v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014 (1982).  In *Fidelity*, the Federal Home Loan Bank board had issued a regulation permitting federal savings and loan associations to include "due-on-sale" clauses in their loan instruments.  The regulation was challenged in

a suit to enforce a conflicting California state law.  In upholding the validity of the regulation, the

Supreme Court explained that:

> A pre-emptive regulation's force does not depend on express
> congressional authorization to displace state law; moreover,
> whether the administrator failed to exercise an option to promulgate
> regulations which did not disturb state law is not dispositive. Thus,
> the Court of Appeal's narrow focus on Congress' intent to supersede
> state law was misdirected.  Rather, the questions upon which
> resolution of this case rests are whether the Board meant to pre-empt
> California's due-on-sale law, and, if so, whether that action is within the
> scope of the Board's delegated authority.

*Fidelity*, 458 U.S. at 154 (internal citation omitted).  Applying this approach to the present case, one

would ask whether the OCC intended to pre-empt conflicting state law, and, if so, whether that action

was within the scope of the authority delegated to the OCC by Congress.  "Where Congress has

directed an administrator to exercise his discretion, his judgments are subject to judicial review only to

determine whether he has exceeded his statutory authority or acted arbitrarily." *Id.* at 153-54 (citing

*U.S. v Shimer,* 367 U.S. 374, 381-382, 81 S.C5. 1554, 1559-1560 (1961)).  Congress need not

expressly authorize the federal agency to preempt state law; rather, the focus is whether the agency

acted reasonably within the discretion delegated by Congress.  *Id.* at 154.

　　　　Considering the different approaches urged by the parties, the court will apply first *Fidelity*

and then *Chevron* to the questions presented in this case.  Under either analysis, the OCC regulations

are valid.

　　　　Applying *Fidelity*, the Commissioner contends that because Congress did not expressly refer to

operating subsidiaries of national banks, nor did it express an intent that federal regulation of operating

subsidiaries preempt state regulation of such entities, the OCC overstepped its delegated authority in

issuing the disputed regulations.[14]   For example, the Commissioner claims that 12 U.S.C. § 371(a),

which provides that "[a]ny national banking association may make, arrange, purchase or sell loans or

extensions of credit secured by liens on interests in real estate, subject to section 1828(o) of this title and

such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or

order," applies only to national banks.  The Commissioner argues that the OCC went beyond its

discretionary authority when it relied on this statutory provision to issue a regulation that states "[a]

national bank and its subsidiaries may make, sell, purchase, participate in, or otherwise deal in ARM

loans and interests therein without regard to any State law limitation on those activities."  12 U.S.C. §

34.21.  According to the Commissioner, the OCC not only inserted "subsidiaries" when the statute

mentioned none, but the agency also unilaterally declared the preemptive effect of its regulation; had

Congress intended such a result, it would have expressly stated so.

Likewise, the Commissioner argues that 12 U.S.C. § 24 (Seventh) and § 484 refer only to

"national banks" and not to their subsidiaries, or, as the Commissioner classifies them, to their "non-

---

[14]The Commissioner also argues that "state regulation of the non-bank state-chartered mortgage companies, the entities that are in issue here, has been extensive and longstanding," and thus the presumption against preemption should apply to find the Maryland laws valid.  (Def.'s Cross Mot. for Summ. J. at 10-11) (citing *New York State Conf. Of Blue Cross & Blue Shield v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 1676 (1995) (explaining that preemption claims must be analyzed from the starting presumption that Congress does not intend to supplant state law)).  This argument is not persuasive, considering that states have never regulated national banks; that under 12 C.F.R. § 5.34, operating subsidiaries have been subject to the same regulatory terms as their parent national banks at least since 1966; and that the Supreme Court has declared that historically, "grants of both enumerated and incidental powers to national banks" are "not normally limited by, but rather ordinarily pre-empt[], contrary state law."  *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 32, 116 S.Ct. 1103, 1108 (1996) (internal quotations and citations omitted). *See also Bank of America v. City and County of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002); *Conference of State Bank Supervisors v. Conover*, 710 F.2d 878, 882 (D.C. Cir. 1983).

bank, state-chartered mortgage subsidiaries."  Specifically, the Commissioner claims that 12 U.S.C. §

484,  the statutory provision limiting visitorial authority over national banks to only that which is

"authorized by Federal law" applies to national banks only, and cannot be extended to operating

subsidiaries, which are state chartered entities.  The Commissioner argues that Congress understands

that subsidiaries and parent corporations are legally distinct "persons" and that therefore if Congress had

intended the operating subsidiaries to be treated the same as the national banks, it would have expressly

stated so.  Additionally, the Commissioner points out that Congress has referred explicitly to state banks,

as distinct from federal or national banks, in other laws, such as those pertaining to the Federal Reserve

System.  *See, e.g.,* 12 U.S.C. § 221.

Finally, the Commissioner asserts that the OCC exceeded the authority delegated to it by 12

U.S.C. § 93a when it promulgated regulations governing operating subsidiaries.  Under 12 U.S.C. §

93a, "the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the

responsibilities of the office."  The statutory provision limits the Comptroller's rulemaking power "to the

extent that authority to issue such rules and regulations has been expressly and exclusively granted to

another regulatory agency," and explicitly states that the Comptroller does not have authority to regulate

"securities activities of the National Banks under the Act commonly known as the 'Glass-Steagall Act.'"

12 U.S.C. § 93a.  The Commissioner maintains that Congress has not extended the OCC's rulemaking

authority to include oversight of the national banks' operating subsidiaries.  He argues that nothing in the

National Bank Act or the recent Gramm-Leach-Bliley Act of 1999, Pub. L. No. 106-102, 113 Stat.

1338,  "supports, or even suggests, the necessary Congressional intent to give the OCC exclusive

regulatory authority over non-bank state-chartered mortgage companies such as [National City

Mortgage and First Franklin]."  (Def.'s Cross Mot. for Summ. J. at 19.)

The Commissioner's arguments fail for several reasons.  First, as mentioned previously, it is not

necessary for Congress to explicitly state that it intends federal law, including any agency regulations

promulgated pursuant to a particular statute, to preempt state law.  *Fidelity*, 458 U.S. at 154.  The sole

inquiry is "whether [the Comptroller] has exceeded his statutory authority or acted arbitrarily."  *Id*.

(citing *United States v. Shimer,* 367 U.S. 374, 381-82, 81 S.Ct. 1554, 1559-60 (1961)).  Therefore,

the Commissioner's insistence that the statute's failure "to address preemption" or "to delegate the

power to the OCC to preempt state law as it applies to non-bank state-chartered mortgage

subsidiaries," is misplaced.  (Def.'s Cross Mot. for Summ. J. at 21.)  Here, it is undisputed that the

OCC is charged with "primary responsibility for surveillance of 'the business of banking' authorized by

12 U.S.C. § 24 (Seventh)" and "the Comptroller has discretion to authorize activities beyond those

specifically enumerated." *Nationsbank of North Carolina,* 513 U.S. at 256, 258.  Additionally, the

D.C. Circuit has interpreted broadly the Comptroller's rulemaking authority under 12 U.S.C. § 93a to

hold that the Comptroller may issue regulations that "preempt those state laws that conflict with his

responsibility to ensure the safety and soundness of the national banking system" under the Federal

Reserve Act.  *Conference of State Bank Supervisors v. Conover,* 710 F.2d 878, 885 (D.C.

Cir.1983) (holding that the Comptroller acted within his authority when he issued regulations controlling

the terms under which national banks may offer ARMs).

The Commissioner does not attempt to regulate national banks directly or challenge the OCC's

exclusive visitorial authority over national banks under 12 U.S.C. § 484.  Further, the Commissioner

concedes that under the incidental powers clause of 12 U.S.C. § 24 (Seventh) the OCC has discretion

to authorize national banks to conduct business through operating subsidiaries, as declared by 12 C.F.R.

§ 5.34 in 1966.  *See, e.g., Wachovia Bank,* 319 F.Supp.2d at 280 (D.Conn. 2004); *Wells Fargo*

*Bank, N.A., v. Boutris,* 265 F.Supp.2d 1162, 1168 (E.D. Cal. 2003). As the *Wells Fargo* court

explained, "court decisions determining whether a particular activity is permissible for a national bank

have treated the activities of an operating subsidiary as being equivalent to the activities of the national

bank." 265 F.Supp.2d at 1168-69 (citing *NationsBank,* 513 U.S. at 254; *Marquette Nat'l Bank of*

*Minneapolis v. First of Omaha Serv. Corp.,* 439 U.S. 299, 99 S.Ct. 540 (1978); *American Ins.*

*Ass'n v. Clarke,* 865 F.2d 278 (D.C. Cir. 1988)).  These facts undermine the Commissioner's position

that Congress did not intend for operating subsidiaries of national banks to be treated the same as their

parents, and that the Comptroller has exceeded his authority by doing so.

Contrary to the Commissioner's view, as recently as 1999, when adopting § 24a of the National

Bank Act as section 121 of the Gramm-Leach-Bliley Act, Pub. L. No. 106-102, § 121, 113 Stat.

1338, 1373 (1999), Congress implicitly recognized and affirmed the OCC's approach to regulating

operating subsidiaries of national banks when it defined a "financial subsidiary" as "other than a

subsidiary that...engages solely in activities that national banks are permitted to engage in directly and are

conducted subject to the same terms and conditions that govern the conduct of such activities by national

banks." 12 U.S.C. § 24a(g)(3)(A) **(tracking the language of 12 C.F.R. § 5.34, the OCC regulation**

**authorizing national banks to conduct activities through operating subsidiaries)**.  As one court recently

observed, this provision not only recognizes national banks' **operating** subsidiaries, it presumes that **the**

OCC exercises visitorial authority over them. *See Wells Fargo Bank,* 265 F.Supp.2d at 1168 **(noting**

**that the "financial subsidiary" definition recognizes that operating subsidiaries could exist and quoting**

from S. Rep. No. 106-44 at 8 (1999) ~~which discusses national banks' longstanding practice of investing in and engaging in lending activities through operating subsidiaries~~).  *See also Wachovia Bank,* 319 F.Supp. 2d at 280 (noting that this provision shows Congress has implicitly recognized the ability of a national bank to conduct its authorized activities through an operating subsidiary).  This language contradicts the Commissioner's contention that Congress did not intend operating subsidiaries of national banks to be treated the same as national banks.

Accordingly, the plaintiffs have shown that the OCC did not exceed its delegated authority under the National Bank Act by authorizing national banks to establish operating subsidiaries, and by regulating operating subsidiaries on the same terms as national banks.  Additionally, given the OCC's long-recognized practice of treating operating subsidiaries as arms of national banks, and the fact that Congress authorized the OCC to prescribe "restrictions and requirements" regulating a "national banking association['s]" ability to make real estate loans, 12 U.S.C. § 371(a), the OCC acted within its authority when it issued 12 C.F.R. § § 34.21 and 34.23, which provide, respectively, that "[a] national bank and its subsidiaries may make, sell, purchase, participate in, or otherwise deal in ARM loans" and a "national bank ... may impose fees for prepayments" notwithstanding any state law limitation on those activities.  Further, the record shows that the OCC acted reasonably in making policy choices within its discretionary authority.  The challenged regulations, therefore, are valid under *Fidelity.*

Under a *Chevron* analysis, the result is the same.  The *Wachovia Bank* court recently analyzed the validity and pre-emptive force of 12 C.F.R. § 7.4006 under *Chevron*, accepting the OCC's position that the regulation  merely codified the pre-existing preemption that the OCC understood to already exist "from a combination of pre-existing statutes–section 484, section 24(Seventh), and section

18

371," and noting that this "type of interpretation and extrapolation is precisely the type of interpretation

with which an administrative agency is charged."  319 F.Supp. 2d at 282 (citing *Food and Drug

Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291 (2000)).  I

agree with the *Wachovia Bank* court's determination that the OCC's conclusion, expressed in §

7.4006, that its oversight of national bank operating subsidiaries should be exclusive and pre-emptive, is

a reasonable construction of the federal banking statutes, as they apply to the activities at issue here. *Id.*

at 287-88.  *See also Wells Fargo,* 265 F.Supp.2d at 1170.

Moreover, I find the other OCC regulations governing operating subsidiaries, including those

which  authorize national banks and their subsidiaries to engage in real estate lending and impose

prepayment fees, are reasonable interpretations of the National Bank Act.  It is undisputed that the

OCC has primary responsibility for overseeing the national banking system, and that under the

"incidental" power delegated by 12 U.S.C. § 24 (Seventh), this includes the authority to regulate

operating subsidiaries.  The Commissioner objects, however, to the OCC's claim of exclusive visitorial

and regulatory authority over the operating subsidiaries of national banks.  He argues that Maryland has

routinely regulated such "non-bank state-chartered entities," and that viewing these subsidiaries as

divisions of a national bank offends a state's sovereign right to regulate corporate entities and lenders

within its borders.  The Commissioner further contends that the "MMLL and the restriction on

prepayment fees do not prevent the national bank's exercise of its powers," because the MMLL does

not preclude national banks from having operating subsidiaries, nor does it require national banks to

make mortgage loans through its operating subsidiaries.  This claim mischaracterizes the effect of the

Commissioner's asserted authority over National City Bank's subsidiaries.  A state may not regulate a

national bank where doing so would "prevent or significantly interfere with the national bank's exercise

of its powers." *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 33, 116 S.Ct. 1103,

1109 (1996).  In determining the preemptive scope of federal statutes and regulations granting a power

to national banks, the Supreme Court reasoned that "normally Congress would not want States to

forbid, or to impair significantly, the exercise of a power that Congress explicitly granted."  *Id.*   As the

*Wachovia Bank* court succinctly stated:

> State regulation of national bank wholly-owned subsidiaries
> could reasonably be conceived to have the same obstructive
> effect on national bank operations as they would if they were
> directed at the bank itself.  If the state could regulate national
> bank subsidiaries . . .it could, merely because of differences in
> corporate form, enforce regulations on activities which it could not
> regulate were they conducted through the bank itself.  If, because
> of such regulation, the bank declined to utilize its ability to
> conduct its activity through the subsidiary, it would thus be
> hindered in its exercise of a recognized section 24 (Seventh)
> 'incidental' power.

319 F. Supp. 2d at 286-87.  The court concluded that the OCC's determination that state regulation of

operating subsidiaries "would potentially hinder the bank's 'incidental' power, granted by regulation and

implicitly acknowledged by statute, to conduct its banking business through a subsidiary, is reasonable."

*Id.* at 287.  The same principle applies here to preempt the Maryland Commissioner from exercising

licensing and visitorial powers over National City Bank's subsidiaries or from enforcing the Maryland

Prepayment Restriction.

In the end, the Commissioner essentially advances a policy reason for why his office should be

able to regulate operating subsidiaries and impose the Maryland Prepayment Restriction on them:  in

order to better protect Maryland consumers.  The Commissioner argues that National City Bank's operating subsidiaries are hiding behind their corporate form in order to avoid forfeiting approximately $ 4 million in prepayment fees they have collected thus far.  He maintains that this gives National City Mortgage and First Franklin a competitive advantage over other state-chartered licensed lenders in the state.  He claims that Maryland citizens will be irreparably harmed if his office is precluded from enforcing the Maryland Prepayment Restriction because, had they known that National City Mortgage and First Franklin were not subject to the restriction, they "might have contracted with a licensed mortgage lender that complies with Maryland law, or at the very least would be subject to the appropriate sanctions by the Commissioner."  (Def.'s Cross Mot. for Summ. J. at 43.)

While the Commissioner's concerns may be legitimate, they do not overcome the fact that the National Bank Act, and the regulations promulgated by the OCC thereunder, preempt his efforts to regulate National City Bank's subsidiaries. *See Wachovia Bank,* 319 F.Supp. 2d at 287 (noting that courts have "repeatedly acknowledged that the Act's preemption of state law at times creates disparities between the national bank and state bank competitors, and may at times even create a competitive advantage in the national bank.") It is not the province of the court to evaluate the wisdom of the OCC's determination that national banks should be able to exercise their authority to engage in real estate lending through operating subsidiaries, and to impose prepayment fees on ARM loans.  The OCC has explained in its *amicus curiae* brief that when it promulgated 12 C.F.R. § § 34.21 and 34.23 in 1981, authorizing national banks and their subsidiaries to deal in ARM loans and impose prepayment fees, it did so as part of a greater government effort to provide banks with increased flexibility in designing residential ARM loans in response to a period in the late 1970's and early 1980's that "witnessed an

alarming deterioration in the number of home mortgage lending institutions—housing creditors–in part because of their inability to adjust their long-term mortgage portfolios to the high and widely fluctuating short-term deposit interest rates." (OCC *Amicus Curiae* Memo. at 4) (quoting *Nat'l Home Equity Mortgage Ass'n v. Face,* 239 F.3d 633 (4th Cir. 2001), *cert. denied,* 534 U.S. 823 (2001) (internal quotations omitted).   The OCC stated in the preamble to 12 C.F.R. § 34.23 that "[p]repayment penalties may act as important deterrents to prepayment for the purpose of refinancing when mortgage rates decline.  As such, they may encourage banks to make long-term fixed-rate commitments."  46 Fed. Reg. 18,932 (March 27, 1981).  The OCC hoped that this would enable banks "to minimize the risk of prepayment during the period prior to the first rate change notification date and therefore will be encouraged to make ARMs with long initial grace periods or subject to less frequent rate adjustments." 46 Fed. Reg. 18,939 (March 27, 1981).   Around this same time, Congress amended 12 U.S.C. § 371(a) in order "to provide national banks with the ability to engage in more creative and flexible financing, and to become stronger participants in the home financing market."  (OCC *Amicus Curiae* Memo. at 5 n.2) (quoting S. Rep. 91-536, 97th Cong. 2d Sess. 27 (1982)).

Thus, it is apparent that the OCC's regulations represent a "reasonable" policy determination well within the authority delegated to it by Congress under the National Bank Act. Further, OCC has put forth a permissible construction of the Act, and "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron,* 467 U.S. at 844.   Where, as here, the "challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether

22

it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case,

federal judges–who have no constituency–have a duty to respect legitimate policy choices made by

those who do." *Id.* at 866.[15]

VI.  *Permanent Injunction*

The parties have already entered into a preliminary injunction that enjoins the Commissioner

from enforcing the Maryland Prepayment Restriction or exercising visitorial powers over National City

Mortgage and First Franklin, and the plaintiffs now move for a permanent injunction.  The standard for a

permanent injunction is essentially the same as for a preliminary injunction with the exception that the

plaintiff must establish success on the merits and that the focus on irreparable harm includes the question

whether the plaintiff has an adequate remedy at law.  *Amoco Prod. Co. v. Village of Ganbell, Alaska,*

480 U.S. 531, 546 n.12, 107 S.Ct. 1396, 1404 (1987); *Wilson v. CHAMPUS,* 65 F.3d 361, 364 (4th

Cir. 1995); *Broussard v. Meineke Discount Muffler Shops, Inc.,* 958 F.Supp. 1087, 1108

---

[15]The *amici curiae* briefs filed by the Conference of State Bank Supervisors and the States
Attorneys General, *see supra* note 2, urge the court to recognize the compelling state interest in
regulating mortgage lenders in their states in order to protect consumers from unfair or deceptive
lending practices.  They argue that state agencies are better positioned than the OCC to understand
local housing markets and local consumers, and that Congress did not intend to usurp their role in
regulating lenders such as the operating subsidiaries of national banks.  (*See* Conf. of State Bank
Supervisors *Amicus Curiae* Memo. at 3; State Attorneys General *Amicus Curiae* Memo. at 3.)  For
the same reasons discussed above, these arguments are not persuasive.  In determining that national
banks can engage in mortgage lending through operating subsidiaries, and that these operating
subsidiaries would be treated and regulated as national entities, the OCC made a "reasonable choice
within a gap left open by Congress." *Chevron,* 467 U.S. at 866.

(W.D.N.C. 1997), *overruled on other grounds*, 155 F.3d 331 (4th Cir. 1998).

The plaintiffs contend they will suffer irreparable harm if the Commissioner is granted supervisory authority over National City Mortgage and First Franklin in that the overlapping regulatory regime "will require the expenditure of substantial resources that the Bank and its operating subsidiaries will never be able to recover," and "directly obstruct[ ]and impede[] the Bank's ability to exercise lending power through an operating subsidiary."  (*See* Pls.' Mot. for Summ. J., Ex. 4,  Decl. Of Mary McGuirk at 4.) National City Bank also asserts that if the Maryland Prepayment Restriction is enforced against its operating subsidiaries, it "will lose significant revenues, which it will never be able to recover."  (*Id.* at 3.) The Commissioner disputes the plaintiffs' claim of irreparable harm, arguing that the banks have a duty to reimburse Maryland consumers for the illegal charges levied against them.  Additionally, the Commissioner argues that the public interest will best be served by upholding the Maryland consumer protection laws.

Based on the facts presented, it is clear that the plaintiffs will suffer irreparable harm to their business and their federally authorized banking activities if they are forced to comply with the conflicting Maryland laws.  They have no adequate remedy at law.  Furthermore, where, as here, the court has already determined that the plaintiffs have succeeded on the merits, "the balance-of-harm and public-interest factors need not be taken into account."  *Bank One (Utah), N.A. v. Guttau,* 190 F.3d 844, 847 (8th Cir. 1999) (reversing denial of preliminary injunction and remanding for entry of a permanent injunction enjoining enforcement of state laws that conflict with the National Bank Act).  Once it is determined that the state laws are preempted by federal law, the harm the state may suffer if its laws are

not enforced becomes irrelevant.  Rather, "the public interest will perforce be served by enjoining the enforcement of invalid provisions of state law."  *Id.* at 848.

V.  *Conclusion*

For the reasons stated above, the plaintiffs' motion for declaratory and permanent injunctive relief will be granted, ~~and the defendant's motion for summary judgment will be denied~~.  The court finds that Maryland's Mortgage Lender Law, Md. Code Ann. Fin. Inst. §§ 11-501 *et seq.,* as applied to national banks' operating subsidiaries, is preempted by 12 U.S.C. § § 24 (Seventh) and 484, as well as 12 C.F.R. § § 5.34 and 7.4006.  In addition, the Maryland Prepayment Restriction, Md. Code Ann. Com. Law § 12-105(b)(4), is preempted by 12 U.S.C. § 371(a) and 12 C.F.R. § § 34.21 and 34.23. Accordingly, the Maryland Commissioner of Financial Regulation will be enjoined from enforcing these provisions and from exercising visitorial and regulatory power over the operating subsidiaries of national banks.

A separate order follows.

|  |  |
|---|---|
| __May 5, 2005_____ | _____/s/_____ |
| Date | Catherine C. Blake |
|  | United States District Judge |